## Richmond.

### LEAKE'S EX'OR AND AL. v. LEAKE AND ALS.

### Absent, *Moncure*, P.

I. On the 23d of February, 1859, G, of the firm of G & A, qualified as the executor of S L, and proceeded immediately to convert the assets, except the slaves, into money, realizing therefrom about $25,000 in cash. On the 7th of February, 1860, S F L instituted an action at law against the executor on a claim for $10,000 against the testator; but the executor nevertheless distributed $15,000 of the fund in his hands among the legatees, retaining the residue thereof to meet the result of the action at law. This balance was neither invested nor deposited in the name of the executor, but was deposited in bank to the credit of G & A. On the 14th of July, 1863, the executor, under an *ex parte* order of the circuit court of Richmond, invested $11,000, upon the check of G & A, in a Confederate States bond. HELD:

1. This was an investment of the money of G & A, or of G alone; it was not the money of S L's estate, nor was it money received by the executor in the due execution of his trust; and consequently the said *ex parte* order of court afforded him no protection or security under the statute.

2. The executor, not having kept the fund in question separate from his own funds and capable of being traced and identified, must be deemed to have loaned it to the firm of G & A under the circumstances; and it is well settled that such a dealing with the assets of an estate constitutes a conversion and renders the fiduciary liable in case of loss.

3. It is not legally correct to say that the executor here, or in any case, is a mere stakeholder of the assets; with respect thereto he is something more; he is a trustee having the same property in such assets as the testator had when alive; he has the legal title; he may sell and dispose of the personal effects, and they cannot be followed by creditors and legatees, except in cases of fraud and

collusion; and the law which clothes him with these important powers, exacts from him proper care and diligence in the management of the estate. If he has funds in hand which cannot be paid out to the parties entitled, it is his duty to invest them in safe interest-bearing securities; if he is unwilling to assume any risk, the courts are always open to him for guidance and instruction. Had the executor pursued this course, he would have been relieved of all responsibility, which now he cannot escape upon mere surmises and conjectures that the fund might have perished, if he had pursued it.

2. The statute, Code 1873, ch, 146, § 9, declares that the action upon the bond of an executor or administrator may be brought within ten years after the right of action accrues; and there is no other limitation applicable to the sureties upon the official bond.

3. The doctrine is well established that the executor, as respects legatees and distributees, is to be deemed a trustee exercising a continuing trust, not affected by any statutory limitations. He may rely upon the staleness of the demand, upon any presumption of payment or satisfaction arising from lapse of time or other circumstances unaffected by the statute of limitations; and *semble*, there is no difference in this respect between the rights of legatees, distributees and creditors, under ch. 146, § 9, Code 1873. But however that may be, if there is any limitation in case of a *devastavit* against creditors at all, it is certainly not less than ten years.

4. *Ex parte* settlements of accounts have nothing to do with the operation of the statute of limitations, nor have they any sort of analogy to stated accounts between individuals. Whatever efficacy they may have as evidence rests exclusively upon the long established practice and usage of the country and upon the supposed integrity of the tribunal appointed by law for the adjustment of such matters.

5. An *ex parte* settlement before a county court is a mere matter of evidence—*prima facie* evidence of a due administration of the assets, as far as it goes, until surcharged and falsified by proper proceedings. To the extent to which it is surcharged or falsified, the settlement becomes valueless even as evidence and the liability of the executor is precisely the same as if the settlement had never been made.

6. The action of the creditor or legatee is not upon the account settled, but for the *devastavit*, and the right accrues ordinarily and the limitation commences to run when the wrongful act is committed.

7. A legatee is entitled to nothing until the debts of the testator are paid; he has no claim except upon the bounty of the testator; if he receives payment before the debts are paid, he takes subject to the condition of making restitution, if it becomes necessary to satisfy creditors; and no dealing of the executor with him or advancement made to him, can in any manner affect or modify the liability of the testator's estate to the payment of his debts.

8. Although the executor had in hand sufficient assets to pay both debts and legacies, and although a portion of the assets was actually paid to the legatees and another portion set apart for a creditor, which was wasted by the executor, still the creditor has a right to demand restitution from the legatees.

9. Where legatees are called upon to refund at the suit of a creditor, the general principle is that all must be before the court and the burden apportioned among them, if it can be done, without material delay or injury to the creditor. But if some of the legatees are insolvent, the others will be required to make good the deficiency to the extent of what they have received.

Some time in February, 1859, Samuel Leake died, leaving a will by which he appointed Wellington Goddin, of the firm of Goddin & Apperson, his executor, who qualified as such in the circuit court of the city of Richmond, on the 23d of February, 1859, and gave a bond in the penalty of $70,000, with James L. Apperson, James M. Taylor and Lucian B. Price as his sureties, and the executor proceeded immediately to convert the whole estate, except the slaves, into money. Soon after his qualification, Walter Leake filed a bill in said court against the executor, on behalf of himself and the other legatees for a construction of the will and for directions to the executor on certain points and for a distribution of the estate. The executor, in his answer to said bill, admitted that all the debts had been paid, and in November, 1859, a decree was entered for a divisions of the slaves among the legatees, which was made accordingly, upon the execution of refunding bonds.

On the 7th of February, 1860, Shelton F. Leake brought an action of assumpsit in said court against the executor,

in which he claimed $10,000 for services rendered to the testator, and obtained a judgment in said action on the 26th of June, 1870, for $6,133.33, with interest from Frebruary 7th, 1860, till paid.

It seems that at the time this action was instituted, the executor had in his hands about $25,000 of assets deposited in bank to the credit of Goddin & Apperson, $15,000 of which he distributed to the legatees after the said action had been brought. The balance in hand on the 22d of February, 1861, was $10,246.50, and it remained uninvested until the 14th of July, 1863, when, under an *ex parte* order of said court, the sum of $11,000 was invested, upon the check of Goddin & Apperson, in a Confederate States bond. The executor claimed that this balance had been retained in order to meet the result of the action at law, which the legatees had instructed him to contest.

In March, 1871, Shelton F. Leake brought a suit in the chancery court of Richmond against Wellington Goddin, executor of Samuel Leake, deceased, James L. Apperson, James M. Taylor and Lucien B. Price, his sureties, and others, setting forth his said judgment and alleging, among other things, that the said testator left a large estate, consisting of land, negroes, money and securities, which came to the hands of the executor; that the testator, at the time of his death, owed nothing except the debt due to the plaintiff; that the institution of his action in February, 1860, within a year after the qualification, was notice of his claim to the executor, and that the distribution made by him was a *devastavit*, for which either he and his sureties, or else the legatees, were responsible; and prayed accordingly. An amended bill was filed, which did not materially alter the case as made out by the original bill. Several of the parties answered, and such proceedings were had that on the 10th of February, 1877, Commissioner Evans, to whom was referred the settlement of the accounts of Wel-

lington Goddin as executor of Samuel Leake, deceased, made his report to court, in which he charged the said executor with $11,000 as improperly invested by him on the 14th of July, 1863, and held that the said item charged to the estate as of that date should be stricken from the executor's account.

This report was excepted to by the executor upon several grounds, one of which was that the item of $11,000 had not been specifically surcharged or falsified in either of the bills or before the commissioner, which exception was sustained by the court; and thereupon a decree was entered on the 1st of December, 1877, recommitting the said report, with direction to the plaintiff, Shelton F. Leake, to file before the commissioner a specification in writing of the item or items in the previously settled accounts which he designed to surcharge or falsify, with leave and direction to the executor to reply to said specification; which reply should have the force of an answer—and upon the issue so raised the commissioner was required to report his determination. The plaintiff filed a specification excepting to the said item of $11,000; to which the executor and his sureties, Apperson and Price, replied, relying, among other things, on the statute of limitations as a bar to any relief based on a surcharge or falsification made more than five years after the confirmation of the report in which the said Confederate investment had been passed upon and approved by the court—viz: on the 2d of March, 1865, in the suit of Leake v. Leake's Executor and als.

On the 1st of March, 1878, the commissioner made his report, setting forth the proceedings before him and adhering to the conclusions announced in his former report. And the cause coming on to be further heard, on the 20th of April, 1878, the court confirmed and adopted, among others, the report of March 1st, 1878, except so much as referred to the legatees as to whom no decision was made,

and held that the said executor had committed a *devastavit* in making the said investment of $11,000, and that he and his sureties were therefore personally liable to the estate in a sum which, with interest, was at least equal to the aggregate of the plaintiff's claim as ascertained by Commissioner Evans in his report of February 10th, 1877, and it was accordingly decreed, that on default of payment within sixty days from the decree, execution should issue against the said executor and his sureties for the sum of $6,133.33, with interest, costs and damages; and from this decree the said executor, James L. Apperson, James M. Taylor and L. B. Price obtained an appeal, not to operate as a *supersedeas*, from a judge of this court.

Default of payment having been made, executions were issued against the executor and his sureties, and were returned no effects; whereupon the court, on the 26th of June, 1880, being of opinion that the legatees were compellable to refund at the suit of the plaintiff, and that the residuary legatees should contribute before the other legatees were called upon, and it appearing that the executor and his sureties were insolvent, decreed that executions issue against the residuary legatees respectively for the amounts found due by the commissioner's report of February 10th, 1877; and leave was reserved to the plaintiff, in case of the insolvency of any residuary legatee, to apply for further executions against such as were solvent, to the full amount received by them from the estate of the testator; and from this decree William G. Leake and other legatees obtained an appeal and *supersedeas* from a judge of this court.

*Sands, Leake & Carter,* and *Haw & Waddell,* for appellants.

*Ro. H. Stiles* and *Wm. J. Robertson,* for appellees.

STAPLES, J. It does not distinctly appear at what precise period the executor collected the eleven thousand dollars

involved in this controversy. It may be fairly inferred that
it was early in the year 1859 or '60; for the executor himself
states that he had the money in hand in Feb., 1861. He says
he did not invest it because he expected from term to term
the trial of the appellee's action against the estate, and
thus the matter remained until the war began. It seems
that the money was deposited in the Bank of Virginia to
the credit of Goddin and Apperson, of which firm the ex-
ecutor was a member.

This firm was engaged largely in the auction and real
estate business prior to the war, and must, therefore, have
received and disbursed from time to time a large amount
of money. The trust fund being part of a balance to the
credit of the firm, was necessarily involved in these dis-
bursements.

Any attempt, therefore, to identify or trace it must have
been unavailing. As the war progressed the banks ceased
to deal in anything but Confederate currency; deposits
were made, and checks cashed exclusively in that currency.
When, therefore, the executor in July, 1863, upon the
check of Goddin and Apperson, invested the eleven thou-
sand dollars in Confederate bonds, he invested the money
of Goddin and Apperson, or of Goddin alone. It was not
the money belonging to Samuel Leake's estate. It was not
the money received by the executor in 1859 or '60.

It was not the same in kind, quality, or value. It was
not money received by the executor in the due exercise of
his trust and the *ex parte* order obtained by him. The cir-
cuit court of the city of Richmond could afford him no
protection or security. The statute under which that order
was made did not apply to the case, as has been settled by
various decisions of this court.

The cases on this subject have been cited by counsel,
and are perfectly familiar to the profession. *Campbell's
Ex'ors* v. *Campbell's Ex'or*, 22 Gratt. 649; *Crickard's Ex'or* v.

*Crickard's Legatees*, 25 Gratt. 410; *Kirby* v. *Goodykoontz and als.*, 26 Gratt. 302; *Ammon's Adm'r* v. *Wolfe and als.*, 26 Gratt. 627.

A more tenable ground perhaps than this, one upon which counsel mainly rely, is that the executor was a mere stake-holder of the fund in question, and whilst he so held it, awaiting the termination of the appellee's action, it perished in his hands without his default, and by the operation of causes beyond his control. Now this position would be entitled to more consideration if it appeared that the executor, after receiving the money, had kept it separate from his own funds, capable of being traced and identified as trust money. But the ingenuity of man can make no more out of the transaction than a loan to the firm of Goddin & Apperson. They might have checked upon it, and indeed did check upon it as their convenience or necessity required. It was subject to the claims of their creditors, individual and partnership.

Upon the bankruptcy of the concern, or the death of its members, the money would have passed to assignees or personal representatives, for the payment of debts or for distribution. That such a dealing with the assets of an estate constitutes a conversion and renders the fiduciary liable in case of loss, is well established. As was well said by the supreme court of Maryland, in *Jenkins* v. *Waller*, 8 Gill and Johnson, 223: "By making the deposit in his own name, the guardian gained a credit with the bank, and reaped all the advantages which could be desired from the apparent ownership of the sum deposited. Assuming his authority so to make such a deposit, and having received the benefit, the law declares and justice seems to require that he should bear the loss. The trustee may at all times avoid any risk or responsibility by clothing the transaction in its true colors, and making the deposit, not in his own name, but in the name of him who is the real owner.

"The primary purpose," said Judge Gaston in *Peyton* v. *Smith*, 2 Dev. & Bat. Eq. Rep. 339, "is to secure to the *cestui que trusts* the profits on the use of their money; and the second, to discourage and prevent the application of trust funds to the private purposes of the trustee—a practice which, while it endangers the safety of the property, tends to further faithlessness, and to ultimate dishonesty and corruption."

See Hill on Trustees, and cases there cited, page —, and note; 1 Perry on Trusts, §§ 46, 3 and 4. In one or two decisions, this court has modified the application of the rule in question, but the cases stand on peculiar grounds, and do not at all interfere with the well established doctrines of the courts.

It is not legally correct to say that the executor here or in any case is a mere stake-holder of the assets of the estate. With respect to such assets, the executor is some thing more than a stakeholder; he is a trustee, having the same property in such assets as the testator had when alive. He holds the legal title; he may sell and dispose of the personal effects, and they cannot be followed by creditors and legatees except in cases of fraud and collusion. Clothing the executor with important powers, the law exacts from him proper care and diligence in the management of the estate.

If he has funds in his hands which cannot be paid out to the parties entitled, it is his duty to invest in safe interest bearing securities. If he is unwilling to assume any risk, the courts are always open to him for guidance and instruction.

Had the executor here pursued this plain and simple course, he would have been relieved from all responsibility, and this large sum, no doubt, would have been preserved to the estate. For in the year 1859 and '60 there was no difficulty in loaning money secured by mortgage or deed of trust upon unincumbered real estate.

Such, doubtless, would have been the form of investment adopted in this case. At all events, the executor cannot now escape liability for a palpable violation of duty upon mere conjectures and surmises, that the fund might have perished even though he had pursued the plain course prescribed by the court.

If a rule of that sort were adopted, there would be few cases in which a fiduciary would be held accountable for a breach of trust.

Before concluding this part of the case, I will make a single remark with reference to the cases of Confederate investments that have been before this court. In most of them the fiduciary who received trust funds before the war appears to have awakened to the duty of investing in Confederate bonds only after the currency had become so highly depreciated it was to a great extent worthless as a circulating medium.

This case is no exception to the rule. For this reason I think the circuit court did not err in holding the trustee and his sureties liable to the appellee to the extent of his recovery against the estate.

Our next inquiry is, whether the claim of the appellee is barred by the statute of limitations.

It is insisted on behalf of the appellants, that the executor having settled his executorial accounts before the county court, and credit being there allowed him for the investment, any proceeding to surcharge and falsify these accounts must have been brought within five years from the date of such settlements. The authority mainly relied on to sustain this proposition is *Lupton* v. *Janney,* 13 Peters, 381. It is there said by Judge Story that if parties interested seek to impeach the settled accounts, it should be by a suit brought *recenti facto*—within a reasonable time—and at furthest within the period prescribed by the statute of limitations, for actions at law upon matters of account.

With due deference, it seems to me the rule laid down by Judge Story cannot be maintained. If it be intended to assert that the action against the sureties of an executor must be brought within five years in any case, the position is directly in the teeth of the statute which declares that the action upon the bond of an executor or an administrator may be brought within ten years after the right of action accrues; and there is no other limitation applicable to the sureties upon the official bond.

If it be meant that the proceeding against the executor himself must be within five years, the proposition is in conflict with the well established doctrine that the executor, as respects legatees and distributees, is to be deemed a trustee exercising a continuing trust not affected by any statutory limitations.

He may, however, rely upon the staleness of the demand. Upon any presumption of payment or satisfaction arising from lapse of time, or other circumstances unaffected by the operation of the statute of limitations; whether the same rule applies in favor of creditors and long demands against an executor, may not be so clear.

The provisions of the statute would seem to intimate that there is no difference in this respect between the rights of legatees, distributees. and creditors. For it is declared that as to any suit against the fiduciary himself or his representative, which could have been maintained if he had given no bond, there shall be no other limitation than would exist if the statutory bar had not been enacted. Code 1873, chap. 146, § 9. However that may be, if there is any limitation in case of a devastavit against creditors at all, it is certainly not less than ten years.

In the nature of things, it cannot be true that the liability of the sureties upon the official bond remains after the executor is discharged.

For the sureties, upon a recovery against them, have a

right of recovery at once upon the executor himself. The idea that the *ex parte* accounts can, in any case, have any thing to do with or connection with the operation of the statute of limitations is founded upon a total misapprehension. These settlements have no sort of analogy to stated accounts between individuals. Whatever efficacy they may have as evidence rests conclusively upon the long established practice and usage of the country and upon the supposed integrity of the tribunal appointed by law for the adjustment of such matters; whereas a stated account is founded upon a supposed adjustment between the parties themselves. See 2 Lomax's Ex'ors, 520, and cases cited. An *ex parte* settlement before a county court is a mere matter of evidence, *prima facie* evidence, of a due administration of the assets, as far as it goes, until surcharged and falsified by proper proceedings. To the extent to which it is falsified or surcharged, the settlement becomes valueless even as evidence, and the liability of the executor is precisely the same as though the settlement had never been made. The action of the creditor or legatees is not upon the account settled, but for the devastavit, and the right accrues ordinarily, and the limitation commences to run when the wrongful act is committed. Indeed, the statute now prescribes a plain test for determining when the cause of action is deemed to have accrued in suits upon fiduciary bonds.

It will thus be seen how little the operation of the statute of limitation is effected or modified by *ex parte* settlements before the county court.

Generally the courts are averse from disturbing those settlements after a long lapse of time, and no indulgence is given to parties who have slept upon their rights. And this is perhaps all that can be said with respect to any immunity afforded by these settlements against the demands of creditors and legatees. In the case before us, the ac-

count of the executor was settled in 1864, was returned to the court and confirmed at the March term of 1865. The appellee, of course, had no cause of complaint until his claim was established. His judgment was obtained in June, 1870. His original bill was filed in March, 1871, and his amended bill in 1874.

In the progress of the cause the appellants relied upon the settlement in the county court. And upon the direction of the court, the appellee filed a specification of surcharge and falsification, so far as the investment of eleven thousand dollars was involved; to which the appellee duly answered, and thus the whole matter was fully investigated.

The whole proceeding was in conformity with the usage and practice of the court, sanctioned by several decisions of this court. *Corbin et als.* v. *Mills' Ex'ors and als.*, 19 Gratt. 438, and cases therein cited; 1 Barton's Chy. Practice, § 93.

The next matter of consideration is that branch of the case which relates to the legatees. The executor and his sureties being insolvent, the chancery court rendered a decree against the legatees for the amount which came to their hands respectively. The question is, can they be required, under all the circumstances, to refund at the suit of a creditor. This question has been argued with much ability and learning, orally and in writing. All the cases bearing upon the point have been cited, and the whole subject discussed in every conceivable aspect. The argument of the appellant's counsel, briefly stated, is that assets amply sufficient to pay both debts and legacies came to the hands of the executor; that a portion of these assets were paid to the legatees and a portion set apart for creditors, which were wasted by the executors; that the legatees can not now be called on to refund because they received only what they were entitled to, and which the executor might justly pay; and if the executor has wasted the assets set

apart for the creditors, his misconduct ought not to be visited upon the legatees.

It will require no protracted discussion to show the unsoundness of this position. In the first place, no man can make a gift or voluntary conveyance of his property, or any part of it, which is good against existing debts, however honest his motives, and however prosperous his condition in life.

His donees may be called on at any time within the statutory period to refund for the benefit of his creditors, if the donor's reserved estate should prove to be insufficient to discharge his liabilities. It is vain to say that the donor was at the time possessed of ample estate to pay his indebtedness, as well as to make the gift in question; that the donee had therefore the right to receive it, and may have spent it in the confidence that it was his own.

The claim of the creditor is not affected by any of these circumstances, and he may justly insist that his debtor can not throw upon him the risk of losses resulting from unforeseen casualties and deterioration of property. Suppose that Samuel Leake, the testator, in his lifetime, had advanced these appellants, and had set apart a sufficient fund to pay his creditors, and this fund had perished by the results of the war. Will it be maintained that the appellants would not be compelled to refund, if necessary to meet the claims of creditors?

Upon the death of Samuel Leake his estate passed to his executor, charged with the payment of his debts, as it was in his hands. No dealing of the executor with the legatees, no advancement he might make them would in any manner affect or modify this charge. It is the duty of the executor to pay both debts and legacies, if the assets are sufficient for both. His duty, however, is first to pay the debts. Nor can he, by first paying legatees, throw upon the creditors the risk of losses which may ensue from im-

proper investments, or the depreciation of the assets. The legatee is entitled to nothing until the debts are paid; he has no claim, except upon the bounty of the testator.

If he receives payment before the debts are paid, as is sometimes done, he takes subject to the condition of making restitution, if it becomes necessary, to satisfy creditors. Any other rule would, in effect, make the creditor a guarantee of the conduct of the executor, and the continued solvency both of the executor himself and his sureties—a matter over which he has no sort of control. The creditor has nothing to do with the appointment of an executor, and generally very little to do with that of an administrator. He has the right to presume that the personal representative will faithfully exercise his duty, and that nothing can be legally done to affect his claim upon the assets. The learned counsel for the appellants have cited a number of authorities to sustain their position. I do not deem it necessary to discuss them here. Nearly all of them will be found upon examination, to relate to controversies between legatees, or to controversies between legatees on the one hand and the executor on the other. It is well settled, that a legatee who has been paid cannot be required to refund at the suit of a co-legatee in case of a devastavit by the executor. The reason is, that the assets being sufficient for the payment of all the legatees, the one who is paid has received only what he was justly entitled to, and he cannot be deprived of the fruits of his superior diligence. There is an anonymous case in Salkild, cited by counsel, in which it was held, that real estate devised to sureties for payment of debts and legacies could not be twice charged, where the trustee has received and misapplied the money. It was declared that the land, having once borne its burthen, and the money received, was discharged in the hands of the heir, and parties concerned must look to the trustee. The reason is obvious. Creditors and legatees had no legal claim upon the realty. It was

bound only so far as the testator had chosen to bind it. The rule is very different with respect to the personal assets which constitute the primary fund for the payment of the debts, and are legally bound for the demands of creditors. In *Davis and als.* v. *Newman*, 2 Rob. R. 668, Judge Allen said, speaking for the whole court, that the "assets are always bound to the creditor, and he may pursue them in the hands of the legatee, even though the testator's effects would have been sufficient to pay both debts and legacies." The legatee always takes subject to the liability of being compelled to refund at the suit of the creditor. It is very true, these observations of Judge Allen were not expressly called for by the case except by way of argument and illustration, but they are none the less entitled to great weight as expressing the deliberate views of this court. The same views have been expressed by Lord Hardwicke in *Moore* v. *Moore*, 2 Vesey, 600, and by Chancellor Kent in *Lupton* v. *Lupton*, 2 John. C. R. 614.

The learned counsel says that these are all mere *dicta*. It may be so. I have not taken the trouble particularly to examine the cases. They are the *dicta* of great judges, and may be trusted as furnishing a safe rule for our guidance. The same doctrine is, however, laid down in 1 Story Eq. Ju. § 90; 1 Spence Eq. Ju. 299, marg.; and in 2 Lomax's Ex'ors, p. 303.

The case of *Davies* v. *Nicolson*, reported in 2d DeGex & Jones, 693, is, however, a direct authority upon the point. In that case it was held that although specifically bequeathed property had been turned over by the executor to the legatee, it was, nevertheless, liable in the hands of the legatee to the payment of debts, and that, too, notwithstanding there had come to the hands of the executor personal property of the testator, not specially bequeathed, more than sufficient to pay both debts, funeral and testamentary expenses. It was there said, that whatever might be the rights of the specific legatee, as against the executor

or residuary legatee, the legal right of the creditor extended to all the personal estate that came to the hands of the executor.   See, also, *Stuart* v. *Kissam*, 2 Bar. 512; *Pyke* v. *Searcy*, 4 Porter, Ala. 59; *Trescott* v. *Trescott*, 1 McCord Chy. R. 432; *Harris* v. *White*, 5 New J. R. 422; 2 Williams on Executors, p. 1357.

What has been here said applies of course only in those cases where the executor and his sureties are insolvent. The recourse of the creditor is first upon them, in case of a *devastavit*, and the court will not generally pursue the assets in the hands of the legatee unless the action on the executorial bond should prove unavailing.

It must also be understood that the creditor is not in every case entitled to go against the legatee, for he may lose his right of recourse by laches or other circumstances, which would make it grossly unequitable to follow the assets in the particular case.   The appellee does not appear to be within that category.   He brought his suit within a reasonable time after the death of the testator, and, so far as the record discloses, prosecuted it with diligence.   After obtaining his judgment, he promptly filed his bill against his executor, his sureties and the legatees.   It is very true that neither the original nor the amended bill makes any charge with respect to the improper management of the eleven thousand dollar fund by the executor.   Everything appertaining to that subject was brought out in the defence. The more regular course was for the appellee to amend his bill so as to embrace the charge of a *devastavit* on the part of the executor; but the object was accomplished by requiring the appellee to surcharge and falsify the executorial accounts in that particular, with liberty to the executor to defend by answer, all of which was done, and the whole matter fully investigated.

Some effort was made to show that the appellee was fully apprised of the payments being made by the executor to

Leake's Ex'or and al. v. Leake and als.

the legatees, and he never at any time made any objection. Nothing, however, reliable or satisfactory on that point has been proven. Suppose the appellee was aware of the fact. I do not know that it was incumbent upon him to make any objection. His claim was not then established. Whilst he did not know the state of the accounts, the executor and the legatees were certainly aware of his claim.

Indeed, it was the legatees who, from the beginning, insisted upon the defence being made. It is·perfectly certain, in the view then taken, that even if the appellee had objected to the advancement of the legatee, no attention would have been paid to those objections. I think, therefore, there is not the slightest ground for any estoppel in this case.

It only remains to inquire to what extent the legatees are liable to contribute to the payment of the appellee's judgment. This becomes a very important inquiry, in view of the fact that some of them are insolvent. Are the others bound to make up the deficiency? or, is each one liable for his pro rata share without regard to the insolvency of the others? The learned judge of the chancery court was of opinion that each legatee, if necessary, must refund the whole of what was paid to him.

He declares that the rule of contribution was established . for the benefit of the legatees, but it cannot be permitted to operate to the prejudice of the creditors. I cannot see how this conclusion can be avoided when you once establish or admit the right of the creditors to pursue the assets in the hands of the legatee. For, as was said in *Davies* v. *Nicolson,* the law fixes on the whole personal estate a liability to the debts, and the account, when taken, extends to all the personal estate which came into the hands of the executor. The only recognized exceptions to this rule are in those cases in which the assets are administered by the court for the benefit of creditors and legatees. If a cred-

itor does not come in and assert his demand until some individual legatees are paid, and there are left in court funds to be appropriated to the legatees who have not been paid, it has been held that he is entitled in such case only to such proportion of his debt out of the fund in court as would have been payable if he had applied before the legatees were paid. For the residue, he must go against the paid legatees. The reason assigned is, that the court, having distributed the assets, and the creditor being in default, not having come in under the decree, he cannot impugn what has been done, except by submitting to such equitable terms as the court might think proper to impose.

A diffierent rule prevails where the executor undertakes, without the sanction of a court, to pay legatees and make distribution of the funds. This distinction is fully recognized in *Davies* v. *Nicolson* and the cases there cited. See also 2 Williams on Executors, p. 1357. The general principle is, that all the legatees must be before the court if solvent, and the burden apportioned among them, if it can be done without material delay or injury to the creditor.

If, however, some of the legatees are insolvent, the others will be required to make good the deficiency to the extent of what they have received. *Hopkirk* v. *Dennis*, 2 Mun. 326; *Chamberlayne* v. *Temple*, 2 Ran. 400; *Lewis* v. *Overby*, 31 Gratt. 691; *Ryan's Adm'r* v. *McLeod*, 32 Gratt. 375. Upon the whole case, I think the decree of the chancery court should be affirmed.

CHRISTIAN, ANDERSON and BURKS, J's, concurred in the opinion of *Staples*, J.

DECREE AFFIRMED.